[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a marital dissolution action filed on September 13, 1993. Over the past several months, on various trial days, the court has heard testimony and received numerous documents relating to the parties' respective claims. The parties disagree with respect to the issues of alimony, property disposition, and allocation of debts. In addition, the parties have a dispute concerning whether the court should modify its temporary order of alimony. Based on the evidence adduced at the hearing, the court makes the following findings and orders.
FACTUAL BACKGROUND
Elaine, and Alan Milbauer were married on August 23, 1964 in Bridgeport, Connecticut. Prior to bringing this action, both parties resided continuously in Connecticut for more than one year. While two children have been born to the parties, both are over the age of eighteen and graduated from college. The plaintiff's birth name was Elaine F. Friedman.
Mrs. Milbauer is fifty five years of age. She is a high CT Page 9735 school graduate, and has taken various post-high school courses over the years at the University of Bridgeport, the University of Connecticut, and at a community college, including accounting, statistics, algebra, local government, and real estate. Mrs. Milbauer was employed at the time the parties were married, and continued her outside employment until pregnant with the parties' first child. Remaining at home to care for the children while they were very young, Mrs. Milbauer returned to outside employment in 1976. She worked as a bookkeeper for Peter Stanley Greenhouses for approximately four years, and later as a bookkeeper for a Certified Public Accountant for approximately eight years. During the marriage, she maintained the parties' books, and readied the parties' financial papers for submission to their tax preparer. For the past eight years she has worked for the Town of Somers, with her salary increasing from seventeen thousand ($17,000) dollars a year to its present level of twenty four ($24,000) thousand a year. As Administrative Assistant to the First Selectman, her duties have included general office administration, and some computer usage, including word processing. She has also exercised administrative responsibility relating to the provision of general assistance to Somers residents.
The plaintiff moved from the family residence on November 1, 1993 initially to an apartment in Stafford Springs. Since September, 1996, she has resided at 200 Billings Road, Somers, a single family residence in her name alone, with Peter Irwin, a gentleman with whom she rekindled an old romantic relationship in 1993. Mrs. Milbauer testified that at the end of May, 1993, Mr. Irwin, seeing her name on a mail box, stopped by the house, and from that point they renewed their old friendship. She stated that from May, 1993 to November, 1993, she spoke frequently with Mr. Irwin on the phone, had lunch with him occasionally, and went to his apartment to study from time to time. Though denying that she has had a sexually physical relationship with Mr. Irwin since 1993, the plaintiff admits that she had sexual intercourse with him in 1975 or 1976. While the court confronts her denials of a present physical relationship with skepticism, proof or disproof of this issue neither contributes nor detracts from the court's conclusion that this early-marriage romantic relationship was renewed while the Milbauers were still residing together in the spring of 1993 and contributed to the failure of the parties' marriage. While perhaps not actually residing with Mrs. Milbauer until 1996, Mr. Irwin was a frequent guest, overnighting approximately ten to twelve times a month with the plaintiff CT Page 9736 starting in 1994 until he officially changed his residence in September, 1996.
Also corrosive to the marriage was the plaintiff's relationship with Peter Stanley, with whom, she worked in the mid 1980's. During her employment as a bookkeeper for Stanley Greenhouses, the plaintiff maintained a joint personal account with Mr. Stanley. On April 6, 1985, the account had a balance of fifteen thousand sixty three ($15,063) dollars. The plaintiff claimed that this money was, in fact, Mr. Stanley's, and that she maintained the account with him as an accommodation because he was going through a divorce. Perhaps in corroboration of Mr. Stanley's precarious marital state at the time, the plaintiff's calendar contains a notation that on August 19, 1985 she had an appointment at 11:20 a.m. with "PWS re: possible divorce." Defendant's Exhibit DD, Plaintiff's calendar for February and August, 1985. Additionally, the plaintiff acknowledged at trial that prior to August, 1985, the parties' daughter had arrived at the family home and found her and Mr. Stanley in the parties' bedroom. While the defendant testified that their daughter found the plaintiff and Mr. Stanley on the bed in a darkened bedroom, the plaintiff stated that Mr. Stanley was at the house for a business reason, and that she and he were sitting on the floor in the bedroom. The court does not credit, as trustworthy, the plaintiff's testimony that Mr. Stanley's presence in the house, and the parties' bedroom, was for a legitimate business purpose and not for any personal reasons. The combination of this unfortunate event together with the existence of a joint personal account with Mr. Stanley, as well as the fact that the plaintiff chose to accompany Mr. Stanley to a legal meeting to discuss a possible divorce, all belie the plaintiff's claim that she had no more than a business relationship with this gentleman. Whether or not it was physically intimate, the plaintiff's attentions to Mr. Stanley and her involvement in his marital disharmony were not behaviors conducive to the maintenance of a viable spousal relationship with the defendant.
The plaintiff claimed that she ultimately left the marital home out of fear of the defendant. She stated that she found him listening to her phone calls, and awakened to find him standing over her bed. While the defendant may have, in fact, attempted to listen in on the plaintiff's phone calls, and it is clear that he was distressed by the status of their marital relationship in 1993 and became withdrawn from the plaintiff, the more probative evidence is that the failure of the marriage was occasioned CT Page 9737 primarily by the plaintiff's unfaithfulness to the defendant and her ultimate decision to leave the marriage in order to take up with Mr. Irwin.
In the early years of the marriage, the parties moved several times, living in an apartment owned by the plaintiff's parents, in a residence they purchased in Springfield, Mass, and then in the Milridge Road residence until their separation. While this home was originally in both parties names it was transferred to the plaintiff's name alone during a time that the defendant's business relationships caused concern to the parties.
In February, 1996, Nancy Zaccardi and her children moved into the former marital residence with Mr. Milbauer. While she was unemployed when she initially lived with the defendant, Ms. Zaccardi presently earns approximately twenty five thousand ($25,000) dollars a year working for a women's health group in Enfield. Ms. Zaccardi and her two children moved with Mr. Milbauer from Milridge Road to their present rental facility in Enfield when the marital residence was sold earlier this year. She contributes sporadically to the household expenses. Since Ms. Zaccardi and Mr. Milbauer met on December 30, 1994, approximately a year after the Milbauer's separation, there is no claim, nor any evidence, that Mr. Milbauer's relationship with Ms. Zaccardi contributed to the breakdown of the marriage.
Mr. Milbauer is fifty six years old and a graduate of Quinnipiac College. During the early years of the marriage, he worked part time while he completed his college degree in Business Administration and Marketing. Subsequently, he had a series of jobs, including mail order sales, and various retail product sales until he went into the furniture sales business in the mid 1970's as a manufacturer's representative. In April, 1994, Mr. Milbauer was informed of a change in his sales territory and in his commission arrangement, removing certain profitable geographic areas and extending more rural territories in Northern New England. While the geographic area the defendant covers has been enlarged, he has lost certain large retail furniture stores as accounts because these stores now deal directly with the manufacturer. In addition, his commission for dealing with certain remaining large accounts has been reduced. As a consequence of these changes, Mr. Milbauer's income has been reduced since 1994 while his traveling expenses have not been similarly decreased. A review of the parties' Federal income tax returns reveals that in the past seven years, Mr. Milbauer's CT Page 9738 earnings have been as follows:
Gross Taxable
1990 $85,051 23,771
1991 65,221 27,792
1992 99,617 37,855
1993 100,433 69,294
1994 66,830 43,883
1995 55,521 32,184
1996 50,869 30,847
During these same years, Mrs. Milbauer's salary has been as follows:
1990 $21,502
1991 19,900
1992 20,396
1993 21,579
1994 22,907
1995 23,958
1996 24,496
MOTION TO MODIFY ALIMONY
On November 15, 1993, the parties entered into a pendentelite stipulation, then made an order of the court, that the defendant would pay the plaintiff temporary alimony of five hundred ($500) dollars a week. In addition the agreement and order provided that neither party would dispose of any assets, and that the defendant would pay for certain furnishings he had ordered for the plaintiff's home. The agreement and order further provided that the plaintiff . . . "may go into the property owned CT Page 9739 jointly by the parties at 23 Milridge Road, Somers, Ct., which is now occupied by the defendant upon one day's notice to the defendant at mutually agreeable times, without interference by the defendant." cf. Court File, Parties pendente lite agreement, dated and filed with the court on November 15, 1993. In conjunction with this agreement and order, the plaintiff submitted a financial affidavit indicating weekly gross income of four hundred ten ($410) dollars, and a net of two hundred sixty five ($265) dollars as an administrative assistant from the Town of Somers. The defendant filed an affidavit showing weekly gross earnings of one thousand nine hundred seventy three ($1973) dollars and a net of nine hundred eighty one ($981) dollars as a self-employed manufacturer's representative. He also showed a director's fee of nineteen ($19) dollars a week. On the liability portion of his affidavit, the defendant made a notation that he had a contingent liability of seventeen thousand ($17,000) dollars due as Federal taxes due in 1993 based on an individual return.
The defendant testified credibly that he did not pursue his Motion to Modify when filed, or at subsequent dates when it was reclaimed, because he was hopeful that the entire case would settle. Additionally, he indicated that in 1993, 1994, and 1995 he was being treated medically for a depressive disorder which influenced his decision not to pursue his motion. Finally, the defendant testified credibly that he thought he had an interim agreement with the plaintiff that she would accept the lesser payments he was sending her in satisfaction of the court order.
The court is authorized to modify a temporary order of alimony upon a showing of a substantial change of financial circumstances from the date of the original pendente lite order. In this case, such a change occurred in June, 1994 when the defendant's business arrangements were altered to decrease his more profitable business accounts while not lessening his travel requirements. Once the court determines that a substantial change of financial circumstances has occurred, the court is authorized to make any modification effective to the date the motion to modify was filed. In this case, while the court does not favor self help, the court finds, as credible, the defendant's claim that he did not pursue his motion to modify in a timely manner because he was engaged in negotiations with his spouse and because he believed that the plaintiff had decided to accept his lower payments in satisfaction of the court order. Additionally, though the plaintiff did file a motion for contempt, she has not CT Page 9740 pursued it at any time. While these factors do not operate to nullify the order, they," together with the timing of the change in the defendant's finances, comprise the framework for the court's determination to effectuate the modification as of the date of its filing.
Accordingly, the defendant's motion to modify is granted. Effective June 20, 1994, the defendant is ordered to pay to the plaintiff, as alimony pendente lite, the sum of one hundred twenty five ($125) a week. The court finds that, as of June 20, 1994, the defendant was current with respect to the then existing alimony order. Additionally, the court finds that the defendant has paid the following amounts in satisfaction of the pendentelite order since June 20, 1994:
1994-0
1995-$9000
1996-$4400
1997-$1275 through April 27, 1997
The court finds that there is an arrearage due from the defendant to the plaintiff in the amount of one hundred twenty five ($125) dollars a week for each week starting on June 20, 1994 up to and including the last week of August, 1997, less credits for the amounts paid as found supra, and for any amounts paid subsequent to April 27, 1997. This arrearage shall be paid by the defendant to the plaintiff from his share of the escrow account as stated infra. In making this determination, the court has taken into consideration the factors enumerated in Connecticut General Statutes §§ 46b-83 and 46b-82, except that the court has not considered the causes for the dissolution. Additionally, with respect to the estate of each of the parties, the court has considered the existence of the November 15, 1993pendente lite order preventing the parties from utilizing certain assets, including liquidities, and from transferring or disposing of assets.
ALIMONY
The plaintiff seeks an order of alimony of two hundred fifty ($250) dollars a week for not less than sixteen years. The defendant wishes to pay no alimony. In determining this issue, CT Page 9741 while the court has determined that the primary cause of the marital failure has been the plaintiff's unfaithfulness, cause of the dissolution is simply one of several factors for the court to consider. Cf. C.G.S. § 46b-82. While considering all the statutory factors, the court finds particularly relevant the length of the marriage, the ages of the parties, their respective educations, work history, work prospects, actual earnings, and the distribution of assets as set forth infra. The court notes that the plaintiff, while she does not have a college education, is a skilled and experienced bookkeeper and office administrator. The court is mindful, however, that the longevity of her present employment is dependant on ever shifting political winds. Untenured in her position, the plaintiff risks the loss of her employment at each municipal election. On the other hand, the court finds that the defendant's business climate changed for the worse in 1994, leaving him with a less profitable market, and lower prospects for remuneration in the future. For the defendant, a furniture salesperson since 1976, the wholesale and distribution of furniture has been his economic life blood for more than two decades. His opportunities for alternate employment are minimal. Based on all the evidence adduced at the hearing, and mindful of applicable statutory and decisional law, the court orders the defendant to pay to the plaintiff weekly alimony in the amount of eighty ($80) dollars for a period of ten years, the outside term of which shall not be subject to modification by extension. By this time both parties shall be eligible for the receipt of Social Security, and the plaintiff, having been married to the defendant for the requisite time, shall be entitled to the receipt of social security benefits based on the defendant's earnings history. In making this order, the court is mindful that the plaintiff is presently cohabitating with an unrelated male. The court is unpersuaded, however, that Mr. Irwin's presence has had any economic impact on the plaintiff's financial needs to this point. Cf. C.G.S. § 46b-86 (b).
MARITAL ASSETS AND DEBTS
While the identity and value of most of the parties' assets are not disputed, the parties disagree concerning the value of the defendant's interest in a company known as UFO Distribution Corporation, the equity in the plaintiff's Billings Road real estate, and the plaintiffs interest in certain properties and funds now or formerly held jointly with her parents and/or her sister Diane Gluck. With little exception, the parties have no agreement concerning the ultimate ownership of their assets. CT Page 9742
On May 11, 1990, the plaintiff's parents transferred their interest in real estate at 23 Winchester Drive, Shelton, Connecticut, to the plaintiff and to Diana Gluck, her sister, as tenants in common. At the commencement of this action, the plaintiff retained her one half interest in this property, which had a fair market value of one hundred eighty five thousand one hundred eighty two ($185,182) dollars, subject to a life interest in the plaintiff's mother with a value of sixty four thousand ($64,000) dollars. As a result, the plaintiff's one half interest in this asset was and is valued at sixty thousand five hundred ninety one ($60,591) dollars. Notwithstanding the freeze order dated November 15, 1993, on August 26, 1996 the plaintiff quit claimed her interest in this property to her sister for no consideration. In making its orders for the disposition of property, the court has taken into consideration the plaintiff's wilful violation of the court's order prohibiting any such transfers. Whether or not this property was in the plaintiff's name with her sister merely as an accommodation to their parents, whose residence was the subject of the deed, is not the point. The plaintiff's interest in the property was a subject of the court's pendente lite order proscribing such transfers. This property was transferred to the plaintiff and to her sister equally as tenants in common by their parents as part of their estate planning. The plaintiff quit claimed this property to her sister, for no consideration merely to avoid subjecting it to the court's jurisdiction in conjunction with this marital dissolution. As a consequence, the court has considered the value of the plaintiff's interest in this property prior to its transfer to the plaintiff's sister in formulating its property disposition orders.
Additionally, prior to the freeze order, the plaintiff was the joint owner of a bank account, with her widowed mother in the amount of twenty five thousand, sixty-two ($25,062) dollars. This account, in the plaintiff's mother's social security number, was previously in the name of the plaintiff, and both her parents before her father died. Subsequent to the freeze order, the sum of twenty five thousand ($25,000) dollars was withdrawn from this account by the plaintiff's mother. Since the account was in joint names, and in the plaintiff's mother's social security number, and, since the probative evidence is that the funds deposited into the account were derived from the plaintiff's parents, the court does not find that the withdrawal of these funds violated any court order. In this regard, the court distinguishes the bank CT Page 9743 account from the real property deeded to the plaintiff and her sister because in the latter case, the plaintiffs parents ceded all control or indicia of ownership in the property when they quit claimed it to their two daughters.
During the course of the marriage, the parties invested the sum of thirty one thousand ($31,000) dollars into a business known as UFO Distribution Corporation. Specifically, the defendant owns sixteen hundred (1600) shares of stock, or 15.4% of the outstanding stock in this business. UFO is a company that began as an importer of furniture and that has evolved into a warehousing and freight forwarding company. Serving the wholesale furniture market, UFO has augmented the defendant's ability to service his own wholesale furniture accounts. Due to the change in business conditions, however, the fortunes of UFO have declined in the past three years. Corporate returns show that while the company was previously profitable, it's gross sales have decreased in the past three years, and it lost money in 1995 and 1996. In 1989, UFO serviced four hundred (400) retail furniture stores. As of July 19, 1996, it serviced one hundred twenty two (122) stores.
The parties are in significant disagreement with respect to the value of the defendant's interest in UFO. Based on an analysis of earnings, and applying a very high rate of capitalization, the defendant's expert testified that his interest has a present value of three thousand nine hundred twenty ($3920) dollars. On the other hand, the plaintiff's expert testified that the defendant's interest in UFO is worth sixty five thousand three hundred ninety three ($65,393) dollars based on the value of the company's assets net of its liabilities. With the business apparently losing money, but in ownership of valuable assets, the court disagrees with the approach utilized by the defendant's appraiser. However, the plaintiff's appraiser did not take into consideration the defendant's minority share holder status, and his concomitant inability to force a sale of the company's assets. While the court accepts the plaintiff's approach to valuation as more realistic under the company's financial conditions, some discount should be applied on account of the defendant's minority status. In this regard, the court accepts the defendant's assessment that a fifteen percent (15%) discount should be applied to the defendant's interest. Accordingly, an on the basis of UFO's April 30, 1997 balance sheet, the court finds the defendant's interest in UFO to have a pre-tax value of fifty four thousand seven hundred eighteen CT Page 9744 ($54,718) dollars.
With respect to the 200 Billings Road property, the court finds that it's fair market value is one hundred twenty ($120,000) thousand dollars, and it is subject to a first mortgage in the amount of ninety thousand ($90,000) dollars. While there is documentary evidence to support the existence of a debt owed by the plaintiff to her mother in the amount of fifty thousand ($50,000) dollars, and a mortgage note and deed affirming this debt, it is the court's view that the plaintiff's mother forwarded funds to the plaintiff in conjunction with her purchase of this property partly from funds held jointly by the plaintiff and her mother, and partly as a gift from the plaintiff's mother. The court finds the existence of the note and mortgage from the plaintiff to her mother to be a disingenuous effort to mask this act of generosity on the part of the plaintiff's mother, and duplicity on the part of the plaintiff. Finally, with respect to real estate, the court notes that from the sale of the parties' former marital home earlier this year, counsel for the plaintiff currently holds the sum of one hundred twenty three thousand, eighteen dollars and seventy two ($123,018.72) cents in an escrow account.
In addition to real estate, stock interest in UFO, and the escrow account, the parties have various liquidities, including retirement assets, and other tangible personal property. Except for the UFO stock, the escrow account and the parties' checking accounts, their liquidities, and their values, are posited on the parties' financial affidavits dated July 15, 1997 (plaintiff's Schedule C) and July 14, 1997 (defendant's 4. E, F, G ). The court orders the parties' assets distributed as follows:
The plaintiff shall be entitled to ownership of the real estate located at 200 Billings Road, her interest in the Town of Somers Pension Plan, and the sum of thirty five thousand, seventy three ($35,073) dollars from the escrow account. The defendant shall be entitled to retain his interest in the UFO stock, and to the sum of eighty seven thousand nine hundred forty five ($87,945) dollars from the escrow account.
In addition, the parties shall value the following accounts as of September 1, 1997, and these accounts shall be divided equally between the parties: J. Charles Associates, Megatrends Fund, Charles Schwab account, Corporate Securities Group, Keystone IRA, IRA Idex, Bank of Rockville IRA, Tucker Anthony CT Page 9745 IRA, Tucker Anthony Keogh Plan, and the cash value of the Western Reserve Life Insurance policy. With respect to the insurance policy, in the event the plaintiff wishes to continue to own this policy in her own name, she may have such ownership upon payment to the defendant of the sum of five thousand three hundred seventy five ($5375) dollars from her share of the escrow proceeds. In the event the plaintiff does not make this election, the defendant shall be entitled to purchase ownership of the policy from the plaintiff on the same terms. The plaintiff shall notify the defendant of her decision with regard to the insurance policy within twenty days of this decision, and if she declines ownership of the policy, the defendant shall notify the plaintiff within ten days thereafter of whether he seeks ownership of the policy. If neither party wishes sole ownership of the policy, it shall be canceled and the proceeds divided evenly between the parties. With respect to the various liquidities which the court has ordered divided equally, the parties are at liberty to negotiate with one another to achieve an equal division of these accounts without actually having to divide each one, but in the event that the parties are not able to make such voluntary assignments, each account shall be divided equally.
Each party shall be entitled to ownership of the motor vehicles and other personal property each possesses, except that the plaintiff shall be entitled to the piano and exer-cycle, which she shall arrange to retrieve within thirty days from the date of this memorandum.
The parties shall be separately responsible for the liabilities listed on their respective financial affidavits, and shall hold the other harmless therefrom, except that the parties shall continue to be jointly responsible, as provided by law, to the Federal and State taxing authorities on account of any past joint income tax filings.
In making its orders for the distribution of assets and liabilities, the court has taken into consideration the relevant factors set forth in C.G.S. § 46b-81 as well as pertinent decisional law.
The defendant is presently covered under a policy of health insurance available to the plaintiff through her employment. The defendant shall be entitled to continue his coverage under such policy, at no cost to the plaintiff, so long as he remains eligible pursuant to the terms of the policy and applicable law. CT Page 9746 To effectuate this provision, the plaintiff shall notify her employer in writing, within thirty days of this date, of the parties' marital dissolution, of the defendant's desire for continuing coverage, and of his present address so that the Town of Somers may correspond directly with him.
All transfers ordered by the court, and all documents necessary to effectuate the transfers ordered herein shall be accomplished with forty five days from the date of this decision unless otherwise noted.
The plaintiff shall be entitled to the restoration of her birth name, Elaine F. Friedman.
The court enters no orders requiring either party to pay the counsel fees or litigation costs of the other. Judgment may enter dissolving the marriage on the basis that it has broken down irretrievably. Counsel for the plaintiff shall prepare the judgment file.
Bishop, J.